**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| **INVESTORS CAPITAL CORP.; and** | ) | |
| **OKE ANANABA,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No. _____** |
| | ) | |
| **DUNCAN-WILLIAMS, INC.;** | ) | |
| **E-D CAPITAL, INC.; and Fictitious** | ) | |
| **Defendants "A", "B", and "C", being** | ) | |
| those corporations, persons, and/or other | ) | |
| legal entities whose identities are as of yet | ) | |
| unknown to the Plaintiffs, | ) | |
| | ) | |
| **Defendants.** | ) | |

## AFFIDAVIT OF A.O. CRIHFIELD

| | |
|---|---|
| STATE OF TENNESSEE | ) |
| | : |
| ___SHELBY___ COUNTY | ) |

Before me, the undersigned authority in and for said County and said State, this day personally appeared A.O. Crihfield, who, being first duly sworn, deposes and says as follows:

1.    I am A.O. Crihfield and I am manager of the department of Duncan-Williams, Inc. that is involved in the purchase and sale of mortgage loans; and I am personally responsible for due diligence in the underwriting of such loans. I have reviewed the records of Duncan-Williams, Inc. and E-D Capital and have personally interrogated all of the employees of both of said companies who might have had any dealings with either ICC or Oke Ananabe at any time, and I also have knowledge of the facts stated herein.

2.    Duncan Williams, Inc. ("Duncan Williams") is an investment banking firm based in Memphis, Tennessee. E-D Capital is a Memphis-based corporation formed by Duncan F.

Williams and his sister, Emily W. Dunn, for the purpose of entering into a loan funding program utilizing its own capital assets. E-D Capital is not a subsidiary of Duncan Williams and does not have common ownership.

3.      On May 6, 2004, E-D Capital and ICC entered into a letter agreement establishing an arrangement whereby E-D Capital would purchase mortgage loans from ICC for the purpose of selling those loans to third parties lenders such as Countrywide, Bear Stearns, or Deutsche Bank. A true and correct copy of the May 6, 2004 letter agreement is attached hereto as Exhibit A. The letter agreement gave E-D Capital a right of first refusal on all loans submitted by ICC that conformed to LIBOR Floater Commercial Loan Program guidelines, attached as an exhibit to the letter agreement.

4.      The May 6, 2004 letter agreement did not create an exclusive relationship between ICC and E-D Capital nor did it obligate E-D Capital to purchase any mortgage loan from ICC. E-D Capital bargained for a right of first refusal, which left ICC with the ability to simultaneously submit mortgage loans to other third party lenders. If E-D Capital did not exercise its right of first refusal as to a particular loan, ICC was free to do business with other lenders.

5.      Oke Ananaba is not a party to the May 6, 2004 letter agreement or to any other agreement entered into by Duncan-Williams or E-D Capital. The only communications that Duncan Williams and/or E-D Capital ever participated in concerning the ICC loan funding arrangement were with ICC employees Ronnie Weeks and Karen McClellan. No one at ICC ever identified Oke Ananaba to E-D Capital or Duncan-Williams as a person having any role in the loan funding arrangement. Mr. Ananaba's name does not appear on any mortgage loan document submitted by ICC to E-D Capital.

6.     No employee, agent, or representative of Duncan Williams or E-D Capital has ever communicated with Oke Ananaba about any subject.  Neither Duncan Williams nor E-D Capital ever made any representations of any kind to Mr. Ananaba.  Neither Duncan Williams nor E-D Capital had ever heard of Mr. Ananaba until the above-captioned lawsuit was filed.

7.     Duncan-Williams and E-D Capital had no reason to contemplate that Mr. Ananaba or a loan broker like Mr. Ananaba would have any role in the ICC loan funding arrangement.  Ronnie Weeks represented to us that ICC would be originating the loans that would be submitted to E-D Capital under the loan funding arrangement.  This representation was put in writing in the May 6, 2004 letter agreement in the first sentence, which stated in part that E-D Capital "will purchase from [ICC] certain mortgage loans **originated by [ICC]** and transfer such mortgage loans to certain third parties ..."  (emphasis added).  No representative of ICC ever told Duncan Williams or E-D Capital that ICC would submit mortgage loans that had been originated by Mr. Ananaba or any other third party.

8.     To induce E-D Capital to enter into the May 6, 2004 letter agreement, ICC representative Ronnie Weeks stated that he anticipated submitting a substantial volume in mortgage loans per month to E-D Capital.  Mr. Weeks also stated that the mortgage loans submitted by ICC would conform to the guidelines set forth in the LIBOR Floater Commercial Loan Program. When ICC actually began to submit mortgage loans, the volume and dollar amount was far less than what Mr. Weeks had stated.  In addition, the  mortgage loans submitted by ICC did not conform to the agreed Loan Program guidelines, were not underwritten to industry standards, and were of very poor quality.  E-D Capital determined that the loans were non-conforming and were such poor credit risks that they could not be re-sold to the third party lender market.  To verify this determination, E-D Capital submitted the ICC mortgage loan

applications to third party lenders, who also determined that the loans were non-conforming and poor credit risks.

9.    Over a period of several months, E-D Capital and Duncan-Williams expended a great deal of money and time trying to find buyers for the ICC mortgages. Duncan-Williams and E-D Capital never realized any revenue from its dealings with ICC.

10.    Eventually, E-D Capital informed ICC that it would not go forward with the loan funding arrangement with ICC. Ronnie Weeks stated that the termination of the loan funding arrangement was no problem because Bay View would buy all of his loans and pay him the premiums that he wanted.   Until the filing of the above-captioned lawsuit, ICC never made any complaint or objection to the termination of the loan funding arrangement.


_A.O. Crihfield_
A.O. Crihfield

Sworn to and subscribed before me
this the 24th day of April, 2006.


Notary Public

My Commission Expires: 3/27/07

May 6, 2004

Investors Capital Corporation
221 East Broad Street
Eufaula, Alabama 36027
Attn: Mr. Robert R. Weeks, Jr.

Re:  Purchase by E-D Capital, Inc. of Libor Floater Program from Investors Capital
Corporation

Dear Mr. Weeks,

E-D Capital, Inc. ("Purchaser") and Investors Capital Corporation ("Seller") intend to enter into an
arrangement whereby Purchaser will purchase from Seller certain mortgage loans originated by
Seller and transfer such mortgage loans to certain third parties (each, a "Third Party"). Purchaser
may be required to provide Seller the name of a Third Party in connection with the transactions
contemplated herein. Seller and Purchaser understand and agree that the identity of said Third
Party, together with Purchaser's relationship therewith, is confidential and is proprietary
information solely held by Purchaser, and Seller hereby agrees not to circumvent any agreement
with Purchaser relating to said Third Party as set forth herein.

Accordingly, Purchaser may reveal to Seller the name of a Third Party in consideration for which
Seller agrees that with respect to said Third Parties (a) the Seller will not, itself or in conjunction
with any other individual or entity, directly or indirectly, communicate with said Third Parties for the
purpose of buying or selling mortgage loans or any interest therein without the prior written
approval of Purchaser, and (b) Seller will not, itself or in conjunction with any other individual or
entity, directly or indirectly, buy or sell mortgage loans or any interest therein to said Third Parties
except through Purchaser. For purposes of this Agreement, Seller shall include its officers,
directors, employees and agents; its successors and assigns; any of its present or future affiliates;
and the officers, directors, employees and agents of those affiliates.

Without the prior written consent of Purchaser, Seller will not disclose to any person, unless
otherwise required by law in the opinion of Seller's counsel and upon prior written notice to
Purchaser: (a) the fact that a Third Party's name has been made available to it or that it has
conducted any review of a Third Party; (b) the fact that any discussions or negotiations are taking
place with Purchaser concerning a Third Party; or (c) any of the terms, conditions or other facts
with respect to a Third Party, including the status thereof and whether or not Purchaser has made
a bid, proposal or offer in connection therewith. The term "person" as used in this Agreement
shall be broadly interpreted to include, without limitation, any individual, corporation, partnership,
joint venture, association, joint stock company, trust, limited liability company, unincorporated
organization or government or any agency or political subdivision thereof.

Seller and Purchaser also agree that the confidentiality and non circumvention set forth in this
Agreement will survive after the termination of this Agreement.

*Exhibit A to A.O. Crihfield's Affidavit*

Seller agrees to give Purchaser the right of first refusal on all loans that conform to the LIBOR Floater Commercial Loan Program attached hereto as Exhibit A.

Seller understands and agrees that no failure or delay by Purchaser in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any right, power or privilege hereunder.

The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provision of this Agreement, which shall remain in full force and effect.

Agreement shall be binding for three (3) years from the date of execution and will be automatically renewable in one (1) year terms unless written notice of termination is delivered to Seller sixty (60) days prior to the expiration of Agreement.

Termination of Agreement can occur by the mutual accord of both Seller and Purchaser if done so in writing with sixty (60) days notice.

The terms of this Agreement and the rights of the parties hereunder shall be governed by and interpreted in accordance with the laws of the State of Tennessee, without regard to conflicts of laws. Seller agrees to indemnify and hold harmless Purchaser from any damage, loss, cost or liability (including legal fees and the cost of enforcing this indemnity) arising out of or resulting from any (a) unauthorized use or disclosure by Seller of a Third Party's name and (b) any breach by Seller of any provision of this Agreement. Seller acknowledges that money damages would be both incalculable and an insufficient remedy for any breach of this Agreement by Seller and that any such breach would cause Purchaser irreparable harm. Accordingly, Seller agrees that in the event of any breach or threatened breach of this Agreement, Purchaser, in addition to any other remedies at law or in equity it may have, shall be entitled, without requirement of posting a bond or other security, to equitable relief, including injunctive relief and specific performance, without proof of actual damages.

Please acknowledge your acceptance to the terms and conditions of this Agreement by signing in the appropriate space below and returning the same to the undersigned. Telecopy signatures shall be deemed valid and binding to the same extent as the original.

Sincerely,

_signature_

Franklin F. Reid
Vice President

Agreed to and Accepted By:

Investors Capital Corporation

By: _signature_
        Robert R. Weeks, Jr.
        President

E-D Capital, Inc.

By: _signature_
        Franklin F. Reid
        Vice President

# EXHIBIT A

## LIBOR Floater Commercial Loan Program - IC

| Interest Rate: | |
| --- | --- |
| > 680 Credit Score | 30 Day LIBOR + 400 BPS (Adjusts Monthly) |
| ≥ 680 Credit Score | 30 Day LIBOR + 500 BPS (Adjusts Monthly) |
| Interest Rate Floor | Start Rate |
| Annual Cap | 3% |
| Lifetime Cap | 6% |
| Minimum Loan Size | 250,000 |
| Maximum Loan Size | 5,000,000 |
| Aggregate Debt Per Borrower/Entity | 5,000,000 |
| Maximum Properties Per Loan | One (1) Property Per Loan |
| Purpose | Purchase, Refinance, and Cash-Out Refinance |
| Multi-Tenant | Required |
| Property Types | Multi-Family Apartments, Retail Shopping Centers, Offices and Mini-Storages |
| Minimum Units | Five (5) |
| Geographic Coverage | All States Excluding Alaska and Hawaii - Population Must Be Sufficient to Support Project Size |
| Maximum LTV: | |
| Purchase | 80% - Lesser of LTC and LTV |
| Refinance | 75% LTV |
| Cash-Out Refinance | 70% LTV |
| Maximum CLTV: | |
| Purchase | 90% - Lesser of CLTC and CLTV |
| Refinance | 85% |
| Cash-Out Refinance: | 80% |
| Minimum Equity Required: | |
| Purchase | 10% |
| Refinance | 15% |
| Cash-Out Refinance: | 20% |
| Seller Secondary Financing | Minimum 5% - Maximum 10% - Minimum 3 Year Term |
| Minimum DSCR: | |
| Purchase and Refinance | 1.25% |
| Cash-Out Refinance | 1.35% |
| Personal DTI | Not Calculated But Must Be Sufficient to Pay Debt |
| Minimum Occupancy Percentage | 75% |
| Minimum Occupancy Percentage (Self-Storage) | 60% |
| Recourse | Full Recourse Required |
| Borrower's Credit Score | Minimum 620 - Middle of Three/Lesser of Two |
| Hard Lock-Out and Prepayment Penalty | 5 Year Hard Lock-Out and 5%, 5%, 4%, 4%, 3%, 3%, 1% Each Year Thereafter |
| Assumption Fee | 1% (If Approved By Investor) |
| Terms | 15/15, 20/20, 25/25, 30/30 - Based on 75% of Economic Life |
| Origination Fee to Originator | Maximum 1% Origination Fee Incorporated Into Loan |
| Ownership | Minimum 2 Years for Cash-Out Refinance |
| Documentation | Full Documentation on Properties, Guarantors and Entities |
| Verifications | All Documents Must Be Verified and Validated |
| Interest Calculation | 365/360 |
| Escrows | Taxes and Insurance Required |
| Leaseholds | Not Allowed |
| Appraisal | MAI Appraisal Required and FIRREA/USPAP Compliant |
| Environmental | Phase I Study Required |
| Narrative | Required |
| Rent Rolls/Leases | Required |
| NOI | Minimum Two (2) Years and Projected |

### Exceptions to Guidelines Will Be Reviewed on a Case-By-Case Basis

TOTAL P.03