**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| **INVESTORS CAPITAL CORP.; and OKE ANANABA,** | ) | |
| **Plaintiffs,** | ) | |
| **v.** | ) | **Case No. 2:06-cv-0382-ID-SRW** |
| **DUNCAN-WILLIAMS, INC.; E-D CAPITAL, INC.; et al.,** | ) | |
| **Defendants.** | ) | |

**AFFIDAVIT OF RONNIE WEEKS**

STATE OF ALABAMA )
)
COUNTY OF HOUSTON )

Before me, the undersigned authority in and for said County and said State, this day personally appeared Ronnie Weeks who, being first duly sworn, deposes and says as follows:

1. My name is Ronnie Weeks. At all times relevant to the matters alleged in the Complaint I have been part-owner of Investors Capital Corporation (hereinafter "ICC"), and I was a former owner of Financial Brokers of America, the assets of which were eventually assumed by ICC. Accordingly, I have personal knowledge of the facts stated herein.

2. Through my many years in the commercial loan industry, I had come to personally know Don Clanton. Sometime in 2003 Mr. Clanton, who at that time had taken a position with Duncan-Williams, Inc., contacted me about participating with Duncan-Williams in a program involving USDA loans. Through our many conversations

and years of acquaintance, Mr. Clanton was aware of the fact that the commercial loans underwritten by my company came to me by way of referral from a vast network of brokers, lenders, and other business people, commonly referred to as our “Field Force”.

3. Because of the limited amount of funds which the USDA had earmarked for that particular project, ICC decided it would not be economically feasible to participate.

4. Mr. Clanton then made us another proposal: instead of ICC underwriting and selling loans to its customary lenders, Duncan-Williams proposed that we instead underwrite loans which Duncan-Williams would fund, paying ICC the usual 2-6% premium on each such loan. The incentive for ICC rested in Duncan-Williams’ agreement to share evenly with ICC the profits from securitization and re-sale of those loans, thus creating the opportunity for us to earn an additional 1% to 3% on each loan.

5. In order to securitize commercial mortgage loans such as those envisioned by Duncan-Williams’ proposal, they would have to be consolidated and sold to other financial entities in very large blocks. It was discussed between Mr. Clanton and myself that we would need to generate at least $25 million in loans in order to do this. I specifically assured Mr. Clanton that our Field Force could easily accomplish this level of business, and Mr. Clanton acknowledged that it was the strength of our Field Force which prompted Duncan-Williams to approach ICC with this proposal.

6. Once ICC and Duncan-Williams agreed in principle to undertake this project, Duncan-Williams identified Scott Stafford as its representative with whom we would be dealing on a daily basis. Like Mr. Clanton, I had many conversations with Mr. Stafford in which we personally discussed the fact that all of the anticipated loan applications would come via ICC’s Field Force.

7. On at least one occasion, Mr. Stafford asked that ICC disclose the names and contact information for the members of its Field Force, a request which we flatly refused due to the fact that this information is considered proprietary and highly confidential.

8. After the letter agreement was signed between the parties, but prior to the project being ready to begin, Mr. Stafford requested that I "put the word out" about the program to ICC's Field Force. This request was also flatly refused, as I pointed out to Mr. Stafford that doing so may result in the receipt of pre-mature applications, which in turn could result in unhappy borrowers and referring brokers.

9. Eventually, Mr. Stafford contacted me to say that the final preparations had been made, that the program was ready to begin accepting loan applications, and that ICC could notify its Field Force of the program. Soon thereafter, ICC began receiving referrals of commercial mortgage loan applications from as far away as New Jersey and Texas.

10. After ICC began submitting loan applications to Duncan-Williams, and while those applications were met with unnecessary delays and/or refusals, my partner, Karen McClellan, and I had many, many conversations with Mr. Stafford and other Duncan-Williams representatives about the problems we were having with our Field Force as a result of Duncan-Williams' failure and/or refusal to fund the submitted loans.

11. Based upon the above-referenced conversations, the nature of the relationship between ICC and Duncan-Williams, and the scope of the project itself, it is impossible that Duncan-Williams did not know, expect and intend for these commercial mortgage loan applications to arrive by way of referral from other brokers nationwide.

Ronnie Weeks

Sworn to and subscribed before me this the 22 day of May, 2006.

Notary Public

My Commission Expires 7-29-08