**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | |
|---|---|
| **INVESTORS CAPITAL CORP.; and** ) | |
| **OKE ANANABA,** ) | |
|   ) | |
| **Plaintiffs,** ) | |
|   ) | |
| v.   ) | Case No. 2:06-cv-0382-ID-SRW |
|   ) | |
| **DUNCAN-WILLIAMS, INC.;** ) | |
| **E-D CAPITAL, INC.; et al.,** ) | |
|   ) | |
| **Defendants.** ) | |
| _____) | |

**BRIEF IN SUPPORT OF MOTION TO REMAND**

COME NOW the Plaintiffs in the above-styled matter, by and though counsel, and hereby submit this, their Brief in Support of Motion to Remand, which is filed contemporaneously herewith.

**I.   Introduction.**

This case was originally filed in the Circuit Court for Barbour County, Alabama, Eufaula Division. On April 26, 2006, the Defendants removed this action to this Court by claiming that diversity exists among the parties due to the fact that the non-diverse plaintiff, Oke Ananaba, was fraudulently joined. Contemporaneously herewith, the Plaintiffs file their Motion to Remand this matter back to state court, and in support of said Motion the Plaintiffs offer this Court the arguments and points of law set forth herein below.

**II.     Argument.**

    **A.     The Defendants Have Failed to Meet Their Burden of Proof that the Amount in Controversy Exceeds this Court's Jurisdictional Limits.**

The Plaintiffs' Complaint claims an unspecified amount in damages. Where the plaintiff makes an unspecified demand for damages, a removing defendant relying on diversity jurisdiction must **prove by a preponderance of the evidence** that the amount in controversy exceeds the jurisdictional amount. George v. Marriott Senior Living Servs., 2001 U.S. Dist. LEXIS 22822 (D. Fla., November 13, 2001, Decided). Conclusory allegations that the amount in controversy is satisfied are insufficient to satisfy the burden of proving jurisdiction. Owners Ins. Co. v. Bryant, 2006 U.S. Dist. LEXIS 1685 (D. Ga., January 9, 2006, Decided).

The "evidence" presented by the Defendants is nothing more than the following three paragraphs from its Notice of Removal:

> 5.     In this action, ICC alleges that Defendants breached their obligations under a "Loan Program" with ICC to fund and syndicate mortgage loan applications brought to them by ICC. Complaint ¶ 9. ICC and Mr. Ananaba further assert that Defendants made fraudulent promises to fund mortgage loans, negligently failed to procure funding for those loans, and conspired to commit fraud and/or negligence.
> 6.     The Complaint does not specify a monetary demand, but Plaintiffs seek to recover both compensatory and punitive damages. ICC seeks to recover for "[l]ost commissions from those loans which Defendant failed and/or refused to fund" and from "the re-sale of those loans which Defendants failed and/or refused to fund." Complaint ¶ 43. ICC also seeks to recover "[l]ost money from investment of time, money and resources by ICC towards this project" and from "the payout and settlement of claims made upon and/or against ICC and its principals by loan applicants and/or their respective brokers as a result of the Defendants' failure and/or refusal to fund said loans." *Id.* Further, ICC seeks to recover for "[l]ost profits,

> both past and future, resulting from the diminishment of ICC's reputation and good will within the commercial loan industry." *Id.* Mr. Ananaba seeks to recover for "lost commissions," "lost money from the investment of [his] time, money and resources…," and "lost profits, past and future resulting from the diminishment of [his] reputation and good will within the commercial loan brokerage industry." *Id.*
> 7. Plaintiffs' allegations of intentional conduct and the corresponding punitive damages they are seeking demonstrate that the amount in controversy clearly exceeds the jurisdictional minimum of $75,000.

(Notice of Removal, ¶¶5-7).

Such basic re-hashings of non-specific damage claims from the Complaint amount to precisely the kind of "conclusory allegations" which the federal courts have universally held to be insufficient. Despite the Defendants' burden of proof, they have offered this Court no evidence whatsoever as to the potential value of any of the aforementioned claims, leaving this Court either to guess or to simply "take the Defendants' word for it."

This Court should do neither. The Defendants were well aware of their burden upon removing this case, as this area of the law is crystal clear. Because the Defendants have failed to present proof of any kind as to the amount in controversy, this case is due to be remanded to state court.

### B. There Has Been No Fraudulent Joinder, as Oke Ananaba Has Alleged Legitimately Viable Claims Against the Defendants.

As this Court is no doubt aware, the vast majority of fraudulent joinder decisions involve a diverse defendant alleging that a non-diverse defendant was fraudulently joined to defeat complete diversity. In those cases, the standard for fraudulent joinder is clear. *See, e.g.*, Crowe v. Coleman, 113 F.3d 1536, 1538 (11th Cir. 1997) ("In a removal case

alleging fraudulent joinder, the removing party has the burden of proving that either: (1) there is no possibility the plaintiff can establish a cause of action against the resident defendant; or (2) the plaintiff has fraudulently pled jurisdictional facts to bring the resident defendant into state court.").

In this case, however, the Defendants allege the fraudulent joinder of a *plaintiff*, Oke Ananaba. The only decision applicable to this case within the Eleventh Circuit is Hodach v. Caremark Rx, Inc., 374 F. Supp.2d 1222 (N.D.Ga., 2005), which is also cited by the Defendants in their Notice of Removal. Although Hodach is not binding precedent upon this case, its logic, which follows decisions from other jurisdictions, seems sound:

> [W]here the removing party alleges a non-diverse plaintiff has been fraudulently joined, the removing party must prove that either: (1) the non-diverse plaintiff cannot state a cause of action against the defendants in state court (for example, where the non-diverse Plaintiffs claims are barred as a matter of law or the non-diverse plaintiff is not a real party in interest); or (2) the plaintiff has fraudulently pleaded jurisdictional facts to destroy complete diversity.

Id., at 377 (citations omitted).

As recognized by the Hobach court, the party attempting to prove fraudulent joinder carries a heavy burden. Id. This Court is required to evaluate all factual allegations in the light most favorable to the Plaintiffs, and all uncertainties about state substantive law must also be resolved in favor of the Plaintiffs. Id., at 377-78. "If there is even a *possibility* that a state court would find that joinder was proper, the federal court must find that joinder was proper and remand the case to state court." Id., at 378 (emphasis added).

Oke Ananaba states three causes of action against the Defendants: 1) promissory fraud, 2) negligence, wantonness and/or willfulness, and 3) conspiracy. The Defendants argue that Ananaba has been fraudulently joined to this suit insofar as none of these causes of action are colorable under the law. The common thread to all of Defendants' arguments is the assertion that Ananaba was an unknown, unexpected, unintended, and unforeseeable third party. However, nothing could be farther from the truth; and once the Court recognizes as much, the Defendants' Notice of Removal easily unravels.

Ronnie Weeks is part-owner of Investors Capital Corporation (hereinafter "ICC"). (Exhibit D, Affidavit of Ronnie Weeks, ¶1). Through his many years in the commercial loan industry, he had come to personally know Don Clanton, a representative and employee of Duncan-Williams. (Id., at ¶2). In 2003, Clanton contacted Weeks about participating with Duncan-Williams in a program involving USDA loans. (Id., at ¶2). Through their many conversations and years of acquaintance, Clanton was aware of the fact that the commercial loans underwritten by ICC came by way of referrals from a vast network of brokers, lenders, and other business people, commonly referred to by ICC as its "Field Force". (Id., at ¶2). Because of the limited amount of funds which the USDA had earmarked for that particular project, however, ICC decided it would not be economically feasible to participate. (Id., at ¶3).

Clanton, on behalf of Duncan-Williams, then made ICC another proposal: instead of ICC underwriting and selling loans to its customary lenders, Duncan-Williams proposed that ICC instead underwrite loans which Duncan-Williams would fund, paying ICC the usual 2-6% premium on each such loan. (Id., at ¶4). The incentive for ICC rested in Duncan-Williams' agreement to share evenly with ICC the profits from securitization

5

and re-sale of those loans, thus creating the opportunity for ICC to earn an additional 1-3% on each loan. (Id.).

In order to securitize commercial mortgage loans such as those envisioned by Duncan-Williams' proposal, the loans would have to be consolidated and sold to other financial entities in very large blocks. (Id., at ¶5). It was discussed between Clanton and Weeks that at least $25 million in loans would need to be generated in order to do this. (Id.). Weeks assured Clanton that ICC's Field Force could easily accomplish this level of business, and Clanton acknowledged that it was the strength of ICC's Field Force which prompted Duncan-Williams to approach ICC with this proposal. (Id.).

Once ICC and Duncan-Williams agreed in principle to undertake this project, Duncan-Williams identified Scott Stafford as its representative with whom ICC would be dealing on a daily basis. (Id., at ¶6). As he did with Clanton, Weeks had many conversations with Stafford in which they discussed the fact that all of the anticipated loan applications would come via ICC's Field Force. (Id.). On at least one occasion, Stafford asked that ICC disclose the names and contact information for the members of its Field Force, a request which ICC flatly refused due to the fact that this information was considered proprietary and highly confidential. (Id., at ¶7).

After the letter agreement was signed between the parties, but prior to the project being ready to begin, Stafford requested that ICC "put the word out" about the program to the Field Force. (Id., at ¶8). This request was also flatly refused, as Weeks pointed out to Stafford that doing so may result in the receipt of pre-mature applications, which in turn could result in unhappy borrowers and referring brokers. (Id.).

6

Eventually, Stafford contacted Weeks to say that the final preparations had been made, that the program was ready to begin accepting loan applications, and that ICC could notify its Field Force of the program's availability. (Id., at ¶9). Soon thereafter, ICC began receiving referrals of commercial mortgage loan applications from as far away as New Jersey and Texas. (Id.). After ICC began submitting loan applications to Duncan-Williams, and while those applications were met with unnecessary delays and/or refusals, Weeks and Karen McClellan, another part-owner of ICC, had many conversations with Stafford and other Duncan-Williams representatives about the complaints ICC was receiving from its Field Force as a result of Duncan-Williams' failure and/or refusal to fund the submitted loans. (Id., at ¶10).

Jeff Wheatley, a Regional Sales Representative for ICC who is located in Cincinnati, Ohio, attended the 2003 meeting at the offices of Duncan-Williams, Inc. in Memphis, Tennessee at which were present Ronnie Weeks, Don Clanton, and other representatives of Duncan-Williams, Inc. (Exhibit E, Affidavit of Jeff Wheatley, ¶2). Wheatley's son, Brandon Wheatley, also attended this meeting as a representative of the Ohio-based Cardinal Banc, a residential mortgage company which routinely refers commercial borrowers to ICC. (Id., at ¶5).

Wheatley recalls the discussions with Duncan-Williams representatives wherein it was acknowledged that his responsibilities with respect to the project would involve the solicitation of referrals from ICC's nationwide network of brokers, lending institutions, and other contacts and referral sources. (Id., at ¶4). Specifically, it was discussed that Wheatley had the means and access to advertise this project to hundreds, if not thousands, of brokers and/or other potential referral sources within the northern half of the United

7

States. (Id.). It was further discussed with and among representatives of Duncan-Williams that the success of the project would depend upon ICC's ability to solicit loan applications from referring brokers and other institutions such as Cardinal Banc. (Id., at ¶5). According to Wheatley, Duncan-Williams' representatives made it very apparent that there were basically two reasons why they were eager to enter into this project with ICC: 1) the strength of ICC's referral network of brokers, and 2) ICC's skill at underwriting commercial loan transactions. (Id., at ¶6).

In short, based upon these many conversations, the nature of the relationship between ICC and Duncan-Williams, and the scope of the project itself, it is simply impossible that Duncan-Williams did not know, expect, and intend for these commercial mortgage loan applications to arrive by way of referral from other brokers nationwide. (Id., at ¶11). Ultimately, any notion that the Defendants neither expected nor intended for business to be referred via third-party brokers will be completely and utterly shattered by the evidence. At this stage, however, the Plaintiffs carry no burden other than to sufficiently state colorable causes of action against each of the Defendants. Hobach, at 377. As demonstrated below, the Plaintiffs, particularly Oke Ananaba, have met this burden.

### 1. Promissory Fraud.

While generally "[a] stranger to a transaction . . . has no right of action [for fraud]", there is an exception to this general rule: "If a third person is injured by the deceit, he may recover against the one who made possible the damages to him by practicing the deceit in the first place." Thomas v. Halstead, 605 So.2d 1181 (Ala.1992), *quoting* 37 C.J.S. Fraud § 60, p.344 (1943).

Despite the Defendants' repeated assertions that they never had any contact with Ananaba whatsoever, Alabama law is well settled that it is not always necessary to prove the misrepresentation was made directly to the person who claims to have been injured. Id., at 1184. The Thomas court quoted itself from a much earlier opinion, re-stating the well-settled law in Alabama:

> But we may observe that if defendant caused the representations to be made, and the public were intended to be thereby induced to act upon them, and plaintiff was within the class of those so contemplated, the action for deceit against defendant may be maintained by plaintiff, though defendant did not sell the bonds to plaintiff, but sold them to another, and he to plaintiff, both in reliance on the truth of the representations. Id., at 1184-85, *quoting* Sims v. Tigrett, 229 Ala. 486, 491 (1934).

Ananaba has alleged a colorable claim for promissory fraud against the Defendants. He has never claimed to have had promises made directly to him by the Defendants, nor is this fact material to the viability of his claim. The Complaint contains sufficient details to satisfy the heightened pleading requirements of Rule 9. Indeed, the first five pages of the Complaint contain no less than twenty-three paragraphs which describe, in full detail, the "who, what, when and where" of this case. Upon a simple and clear reading of the Complaint, there can be no doubt as to exactly what fraudulent promises the Defendants made to ICC:

> The Defendants, through their respective agents, fraudulently represented to ICC that the Defendants intended to abide in good faith by their agreement with ICC, and that the Defendants would purchase and/or fund any commercial loans and/or loan applications which were in compliance with the parameters defined within the Loan Program. (Complaint, ¶ 30)….
> Oke Ananaba relied upon the fraudulent promises made by the Defendants to ICC by referring several would-be lendees to ICC in reliance upon Defendants' assurances

9

>that the loans would be underwritten and funded in a timely manner, assuming the loans fell within the described parameters of the Program. (Complaint, ¶ 33).

Even the most strained and hyper-technical reading of these paragraphs would put the Defendants on sufficient notice of what fraudulent conduct they have been sued for.

In their Notice of Removal, the Defendants repeatedly refer to a sentence contained in the May 6, 2004 letter agreement between the parties which states that the Defendants "will purchase from [ICC] certain mortgage loans originated by [ICC] and transfer such mortgage loans to certain third parties…." (Defendants' Notice of Removal, ¶ 14). The letter agreement contains no definition or description of the word "originated" as it is used in the context of this agreement. Based solely upon this sentence, the Defendants would have this Court hold that, as a matter of law, the letter agreement did not apply to mortgage loan applications referred to ICC by outside brokers. This is despite the fact that the Defendants were at all times aware that the mortgage loan applications being reviewed had originally been sent to ICC by outside brokers within its Field Force. (Exhibit D, ¶11). Moreover, despite this awareness, the Defendants obviously took no issues with the source of the loans, as the only stated reasons for the Defendants' refusal to fund the loans was because "the volume and dollar amount was far less than what Mr. Weeks had stated" and the loans "did not conform to the agreed Libor Program guidelines, were not underwritten to industry standards, and were of very poor quality." (Exhibit B to Notice of Removal, ¶8). Thus, whatever the meaning of the word "originated" was intended to have within the agreement, it is obvious the Defendants did not intend for it to exclude loans referred by outside brokers.

As an alternative argument, the Defendants cite the case of Bruce v. Cole, 854 Ala. 47 (Ala.2004), for the assertion that "an oral promise that is void by operation of the Statute of Frauds will not support an action against the promisor for promissory fraud." Id., at 58. However, Bruce is inapposite to the case at bar, for it is not a case which involves a claim for "third party" fraud. Rather, it involves a first party promissory fraud claim over an alleged oral agreement which was never reduced to writing and which, by its alleged terms, fell squarely within the auspices of the Statute of Frauds. As the Bruce court pointed out, "if the proof of a promise or contract, void under the statute of frauds, is essential to maintain the action, there may be no recovery." Id., at 58 (citation omitted).

In the case at bar, as opposed to Bruce, there *is* a written agreement, just not one between the Defendants and Ananaba. However, Ananaba needs only prove the existence of the promise/contract between Defendants and ICC in order to maintain his own action for promissory fraud. Indeed, how could it be argued that Ananaba must also prove the existence of a promise or contract between himself and the Defendants, when the very definition of a third party fraud claim means that no direct promise or contract is made between a defendant and the fraud victim? Such an argument defies all logic.

### 2. Negligence, Wantonness and/or Willfulness.

The Defendants next argue that Ananaba has no colorable claim against them for the same reasons that he has no claim for promissory fraud: namely, because he was an unknown, unintended party to whom the Defendants owed no foreseeable duty. The problem with the Defendants' argument is that they ask this Court to resolve questions of disputed fact in Defendants' favor, something which the Court cannot do. Hobach, at 377-78.

The Defendants claim that "ICC never revealed…that Mr. Ananaba or any other person would be involved in the process of submitting mortgage loans to Defendants." (Defendants' Notice of Removal, ¶23). According to Ronnie Weeks, however, nothing could be farther from the truth, as the Defendants were aware from the very start how and from where these loans came about. (Exhibit D). "Where the facts, upon which the existence of a duty depends, are disputed, the factual dispute is for resolution by the jury." Bush v. Alabama Power Co., 457 So.2d 350 (Ala.1984) (citation omitted); *see also* Whataburger, Inc. v. Rockwell, 706 So.2d 1220 (Ala.Civ.App.1997).

This Court is required to evaluate the disputed facts in favor of the Plaintiffs and assume that the Defendants knew at all times that the loan applications sent by ICC had been referred from a nationwide network of brokers just like Mr. Ananaba. Hobach, at 377-78. Further, even if the Defendants were to reply to this Brief with some argument that their knowledge and awareness, alone, should not give rise to a duty, this Court is required to resolve all uncertainties about state substantive law in Plaintiffs' favor, as well. Id. The Defendants' argument that there is not even so much as a possibility that the state court would find proper joinder is a dubious one, at best.

### 3.    Conspiracy.

The Defendants point out the well-settled axiom of law that a "conspiracy cannot exist in the absence of an underlying tort." Avis Rent A Car Systems, Inc. v. Heilman, 876 So.2d 1111, 1124 (Ala.2003). The Defendants then go on to argue that since "Mr. Ananaba cannot point to any underlying tort that Defendants have committed against him…he cannot state a cause of action for civil conspiracy." (Defendant's Notice of Removal, ¶25). To the contrary, however, Ananaba has certainly stated colorable causes

of action against the Defendants, as described above; and any one of these causes of action would serve as a sufficient underlying tort for his conspiracy claim.

### C. Objection to Limited Jurisdictional Discovery.

The Defendants have asked that this Court allow them the opportunity to conduct limited discovery upon the issue of whether or not Ananaba has been fraudulently joined. In support of this request, the Defendants cite Bloodsworth v. Smith & Nephew, 2005 U.S. Dist. LEXIS 38756 (M.D.Ala.2005), as a recent example of this Court having allowed such discovery.

Plaintiffs object to this request on several grounds. First, it is but another tactic (similar to the present Notice of Removal) used to delay and/or prolong this litigation and thereby prejudice the Plaintiffs. Second, this Court allowed limited discovery in Bloodsworth for reasons which are not present in the case at bar. Specifically, the plaintiffs in Bloodsworth failed to satisfy the heightened pleading requirements of Rule 9. In the case at bar, however, the Plaintiffs' complaint sets forth twenty-three paragraphs describing the facts giving rise to this lawsuit.

While the Defendants have made the obligatory argument that Plaintiffs' fraud claims have not been pled with specificity, it is readily apparent from the Defendants' pleadings thus far that they are all-too-aware of what they have been accused of; rather, the Defendants' primary argument centers mainly upon the duty they claim was never owed to Ananaba. Moreover, it was the *plaintiffs* in Bloodsworth, not the defendant, who were allowed to conduct additional discovery "in order to flesh out their fraud claims." Id. As the Court may have already predicted given the affidavits before it, discovery upon

the issue of whether or not the Defendants were aware of Ananaba and others like him is likely to produce the proverbial "swearing match", helpful to no one.

### III. Conclusion.

WHEREFORE, the above premises considered, Plaintiffs respectfully request that this Court grant their Motion to Remand this case to the Circuit Court for Barbour County, Alabama, Eufaula Division.

Respectfully submitted this the 24th day of May, 2006.

/s/ M. Adam Jones
M. ADAM JONES (JON-126)
Attorney for Plaintiffs

Of Counsel:

MORRIS, CARY, ANDREWS,
TALMADGE, JONES & DRIGGERS, LLC
3334 Ross Clark Circle
P.O. Box 1649
Dothan, AL 36302
Tel: 334-792-1420
Fax: 334-673-0077
ajones@mcatlaw.com

L. SHANE SEABORN (SEA-027)
PENN & SEABORN
P.O. Box 688
Clayton, Al 36016
Tel: 334-755-9778
sseaborn1@yahoo.com

**CERTIFICATE OF SERVICE**

      I hereby certify that I have, on May 24, 2006, served a copy of the foregoing pleading electronically via CM/ECF, and will send notification of such filing to:

Hon. Luther M. Dorr, Jr.
Hon. John N. Bolus
Hon. Melinda J. Lucas
MAYNARD, COOPER & GALE, P.C.
1901 Sixth Avenue North
2400 AmSouth/Harbert Plaza
Birmingham, AL 35203-2618

                              /s/ M. Adam Jones